IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 2, 2018

## IN RE PIPER B., ET AL.[1]

**Appeal from the Chancery Court for Lawrence County**
**No. 16-17752      Stella L. Hargrove, Chancellor**

—————————————————————

**No. M2017-00930-COA-R3-PT**

—————————————————————

A mother's parental rights to her two daughters were terminated on the grounds of abandonment by failure to support; substantial noncompliance with permanency plans; failure to manifest an ability and willingness personally to assume legal and physical custody or financial responsibility for the children; and persistence of conditions.  The court also found that termination was in the children's best interest.  The mother appeals.  Upon our review, we hold that the evidence in the record does not support a finding that Mother willfully failed to abandon the children by her failure to pay support; in all other respects, we affirm the termination.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**
**in Part and Affirmed in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KENNY W. ARMSTRONG, J., joined.

Teresa Brewer Campbell, Lawrenceburg, Tennessee, for the appellant, Brittany B.

Herbert H. Slatery, III, Attorney General and Reporter; Kathryn A. Baker, Assistant Attorney General; for the appellee, Tennessee Department of Children's Services.

### OPINION

## I. FACTUAL AND PROCEDURAL HISTORY

This appeal involves the termination of Brittany B.'s ("Mother") rights to her

—————————————
[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

daughters Zoey B., born May 2008, and Piper B., born December 2011.[2]  The children have different fathers whose rights were also terminated in this proceeding; they are not involved in this appeal.[3]  Mother was arrested on January 25, 2014, for drug possession, and the Department of Children's Services ("DCS") filed a Petition to Transfer Temporary Legal Custody to Relatives and for Ex Parte Order on January 31, 2014.  The petition alleged that the children were dependent and neglected due to their mother's drug use and subsequent arrest.  By order entered February 3, the Juvenile Court placed the children in the home of relatives.  DCS filed a Petition for Emergency Custody on February 18, 2014, alleging that "[t]he home where the children were originally placed has notified Lawrence County DCS that they will not be able to care for children."  A bench order entered February 27, 2014, removed the children from the home of the interim caregivers finding that one of the caregivers was in police custody due to a domestic violence incident, and placed the children in the custody of DCS.  An order was filed on June 9, 2014, setting Mother's child support at $205 per month.  The children were adjudicated dependent and neglected by order entered on June 26, 2014.

Permanency plans were created in March 2014, November 2015, April 2016, and November 2016.  These plans required Mother to, *inter alia*: pay support; maintain regular visitation; complete alcohol and drug assessments; resolve all pending legal charges and not incur any new charges; provide a safe and suitable home and allow DCS into the home for unannounced home visits; have a legal, stable income; complete a mental health assessment and follow all recommendations; continue therapy and provide certificate of completion of alcohol and drug program; not use illegal substances or abuse prescription medications; attend and complete domestic violence classes; and participate in family counseling.

Mother completed intensive outpatient drug rehab, and in August 2014, she filed a motion for a 30-day trial home visit; DCS filed a similar motion, seeking a 90-day trial home visit.  The motion was granted and Mother's child support obligations were suspended by order entered September 15, 2014.  After a review hearing, the juvenile court entered an order on December 17, 2014, returning the children to the custody of their mother and "reliev[ing] [DCS] of any further obligations in this case."

In April 2015, DCS received another referral about Mother's drug use and investigated.  The DCS investigator reported that Mother admitted to snorting Lortab and that Mother tested positive for multiple substances.  Mother also had lacerations on her arms and stated that she did not want to live anymore.  Mother was transported to an

---

[2] A third child, born August 2016, was placed with other caretakers and is not at issue in this case.

[3] The fathers of both children were not present at the termination hearings.  Richard D., father of Zoey B., surrendered his parental rights on January 6, 2017.  James S., father of Piper B., was released from prison on October 30, 2016, and was aware of the hearing dates in January and February 2017; he has not appealed the termination of his parental rights.

emergency room and admitted to a psychiatric hospital. On April 29, 2015, DCS filed a Petition to Transfer Temporary Legal Custody to Kin alleging drug abuse and suicidal threats by Mother. The petition sought to have the children adjudicated dependent and neglected. The Juvenile Court entered an order the same day, placing the children in the custody of Pamela B., a family friend and relative of Zoey's father. The children have been in the care of Pamela B. since that time.

In an order entered July 9, 2015, the court wrote that both Mother and Richard D. "waive[d] the adjudicatory hearing, agreeing the children are dependent and neglected as alleged in the Petition." An adjudicatory hearing relating to Piper's father, James S., was held in May 2016, and the court held that he was deemed to have waived the adjudicatory and dispositional hearings, based upon his being served process and receiving notice of the hearing but failing to appear. The court "reiterate[d] its adjudication of Piper [B.] as a dependent and neglected child." The Order of Disposition filed August 17, 2015, found that Mother has "made little progress in complying with the non-custodial permanency plan." An order entered on April 6, 2016, set Mother's child support obligation at $308 plus $10 for arrearages each month.

On September 6, 2016, DCS filed a petition to terminate the parental rights of Mother and the children's fathers. With respect to Mother, the petition alleged the following grounds for termination: abandonment by failure to support, substantial noncompliance with the permanency plan, failure to manifest ability and willingness personally to assume legal and physical custody or financial responsibility, and persistence of the conditions that led to the children's removal. The petition also alleged that termination of Mother's parental would be in the best interest of the children.

A trial on the petition was held on January 10, 2017; January 11, 2017; and February 20, 2017, in the Chancery Court for Lawrence County. Testimony was provided by: Darkis Selman, an investigator with DCS who made initial contact with the family when DCS received a report of a drug-exposed child; Lt. Melinda Brewer of the Lawrence County Sherriff's office who encountered the family during a welfare check in April 2015 and who observed drugs in the home and was told by the children about Mother's drug activity and depression; Dawn Bradley, DCS supervisor who went to the home with Lt. Brewer in April 2015; Jake Beckman, Lawrenceburg Police Officer; William Jewett, Lawrenceburg Police Officer; Nicole Miller, a volunteer at the domestic violence shelter who taught the classes Mother attended until Mother was terminated from the program due to her number of absences; Erin Woo, a friend of Mother's to whom Mother gave custody of her infant so Mother could go to rehab; Tiffany V[.], the children's foster parent; Charity Brown, DCS supervisor at the time the children came into DCS custody; Jessica Yocum, a manager at the Dollar General store who caught Mother shoplifting on January 26, 2017; Kristen Gray, family services worker with DCS who took over on the case in July 2014 and again in August 2016; Jane Rich, the family services worker on this case from October 2015 through August 2016; and Mother.

3

The court entered a very detailed order terminating the parental rights of Mother on April 4, 2017. In the order, the court made adverse credibility findings with respect to much of Mother's testimony. Mother's parental rights were terminated on the grounds of abandonment by willful failure to support; substantial noncompliance with the permanency plans; failure to manifest ability and willingness personally to assume legal and physical custody or financial responsibility; persistence of conditions. The court also concluded that termination of Mother's rights was in the children's best interest. On the motion of DCS to amend the judgment to clarify the finding of abandonment by willful failure to support, an additional hearing was held on June 2, 2017. The court amended its findings relative to the ground of abandonment by failure to support by an order entered on June 21, 2017.

Mother appeals the trial court's decision, stating the following issues for our review:

I.       Whether the trial court erred by terminating the parental rights of the mother by clear and convincing evidence on each issue of Abandonment for willful failure to support, substantial noncompliance with permanency plans; failure to manifest ability and willingness personally to assume legal and physical custody or financial responsibility and persistence of conditions?

II.      Whether the finding of best interest of the children was sufficient when the potential adoptive parents have many issues that possibly should have removed children from their care such as lack of sufficient income, criminal activity and inappropriate parenting decisions?

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Serv. v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

4

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

As this Court observed in *In re M.A.R.*:

> Due to the gravity of their consequences, proceedings to terminate parental rights require individualized decision making. *In re Swanson,* 2 S.W.3d 180, 188 (Tenn. 1999). To that end, we are mindful that in cases of this nature a significant portion of the proof presented at trial consists of testimonial evidence. As such, we must also take account of the following principle which guides our review of a trial court's findings of fact:
>
> > Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett,* 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman,* 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn–Tex Properties v. Brownell–Electro, Inc.,* 778 S.W.2d 423, 425–26 (Tenn. 1989); *Mitchell v. Archibald,* 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.,* 734

S.W.2d 315, 315–16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics Co., Inc.,* 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells v. Tenn. Bd. of Regents,* 9 S.W.3d 779, 783 (Tenn. 1999).

183 S.W.3d 652, 661 (Tenn. Ct. App. 2005).

## III. ANALYSIS

### A. Abandonment by Willful Failure to Support

Tennessee Code Annotated section 36-1-113(g)(1) designates abandonment, as defined at section 36-1-102, as a ground for terminating parental rights. Section 36-1-102 (1)(A)(i) defines abandonment for this purpose as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

"All parents have a duty to support their children." *In re M.J.B.*, 140 S.W.3d 643, 655 (Tenn. Ct. App. 2004); *see also* Tenn. Code Ann. § 34-1-102. A failure to support is "'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005).

On June 9, 2014, the Juvenile Court of Lawrence County set Mother's child support obligation at $205.00 per month; Mother's support obligation was suspended in September 2014 when her trial home visit was granted. That obligation resumed when the children were removed from her home in April 2015. On April 6, 2016, an order was entered setting child support at $308.00 plus $10.00 for arrearages each month.

The Petition for termination was filed on September 6, 2016, and thus the pertinent time period is May 6 through September 5, 2016. During this period, Mother made six total support payments: two per month in the months of May, June, and July. These payments totaled $303.38. Though outside the relevant period, the record shows that Mother made two payments in July 2014 totaling $410.00, and in December 2016, made two additional support payments totaling $293.58.

6

The Chancery Court's amended order stated:

[A]lthough the Court does find Brittany B[.] did make some child support payments during the relevant four-month period, (as set forth in specific detail in the April 5, 2017, Order), the court expressly finds, by clear and convincing evidence, that Brittany B[.] willfully failed to make reasonable payments toward the support of the children under Tenn. Code Ann. 36-1-102(1)(A)(i) given her financial ability to pay such support and, therefore, abandoned the children under Tenn. Code Ann. 36-1-113(g)(1).

Mother does not dispute that she failed to pay child support in the amount ordered during the relevant time period. She contends that she was unable to work at times during the relevant period due to breaking her foot and having a third child in August 2016.[4] Mother testified as follows:

Q. Well, let me back up. You didn't pay child support in the month of in August and around that time -- July. When did you quit work? The baby was born August 1st. When did you quit work?
A. A month or two before that, before August.
Q. Were you put on any kind of medical leave on that?
A. Yes, because I was already dilated to 2.
Q. Did they tell you to take off work?
A. Yes, ma'am.
Q. Okay. All right. And you went back to work, was it about six weeks after the birth of your child?
A. Yes, ma'am.

Mother testified that she worked full time as a certified nursing assistant at a nursing home from August 2015 for "almost a year," making $11.44 per hour. Mother testified that after she broke her foot, she was able to continue working there, on "light duty." She stated that she was terminated "because of me being pregnant and having to be off work [to go to doctor's appointments]." However, further examination and the admission of Mother's separation notice showed that she was terminated because "'Employee was no call, no show on 7/04, 7/05, and 7/06/16.'" Mother testified that in September 2016, she worked at the Fayetteville and Lawrence County fairs and made "like, $400-$500, if not maybe more" for working each, which she testified she spent on "diapers and stuff for the baby." On cross examination, Mother stated that she had forgotten to pay child support.

---

[4] Mother's brief on appeal is largely unhelpful, as it contains few citations to the record and fails to cite to any proof of her foot injuries from which we could discern when the injuries occurred. Our independent review of the record reveals that Mother testified that she broke her foot "in the spring" when she was pregnant. The dates are not clear, but from this testimony and Mother's testimony as a whole, we assume that she broke her foot at some point in the spring of 2016.

The evidence is clear that Mother knew of her support obligation, was able to work during a large portion of the relevant time period until she was terminated, and made some support payments while she was working at the nursing home. However, the amounts paid were below the amount she was ordered to pay. There is evidence in the record that Mother had some ability to work, attempted to pay support by making payments that were more than just "token" support, and had only minimal living expenses due to living with friends and acquaintances. However, the proof of her broken foot and childbirth during the relevant time period do not leave us with the firm belief or conviction that she had the capacity to work throughout the pertinent period of time. We therefore hold that the record does not contain clear and convincing evidence of Mother's abandonment by failure to support, and reverse the trial court's determination in this regard.

## B. Substantial Noncompliance

A court is authorized to terminate parental rights when there is "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4." Tenn. Code Ann. § 36-1-113(g)(2). In order to justify the termination of parental rights, the parent's noncompliance must be "substantial." *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008). Expounding upon this requirement, the court in *In re M.J.B.* stated,

> Terminating parental rights based on Tenn. Code Ann. §36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed, the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, [No. M2002-02235-COA-R3-JV,] 2003 WL 21266854, at *12 [(Tenn. Ct. App. June 3, 2003)]. Trivial, minor, or technical deviations from the permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548; *Department of Children's Servs. v. C.L.*, No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App. Aug. 29, 2003) (No Tenn. R. App. P. 11 application filed).

140 S.W.3d at 656-57. Whether there has been substantial noncompliance with the requirements of the permanency plan is a question of law and is reviewed *de novo* with no presumption of correctness. *In re R.L.F.*, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008),

8

abrogated on other grounds by *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015) (citing *In re Valentine*, 79 S.W.3d at 546). Whether there has been substantial noncompliance with the requirements of the permanency plan is a question of law and is reviewed *de novo* with no presumption of correctness. *In re R.L.F.*, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008), abrogated on other grounds by *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015) (citing *In re Valentine*, 79 S.W.3d at 546).

The permanency plan required Mother to: complete a mental health assessment and follow the recommendations; follow court orders regarding visitation; keep in touch with the Department; not associate with anyone on drugs or associated with drugs or illegal activity; continue an alcohol and drug program at Centerstone and provide proof of completion; submit to and pass random drug screens and pill counts; refrain from using illegal substances or abusing prescription medication; comply with probation; have a legal, stable income to support herself and the children and provide proof of employment; have a safe, suitable home for herself and the children; permit Department home inspections; attend domestic violence classes; complete parenting and family counseling; and sign releases of information so that the Department can get copies of provider reports. Mother's requirements under the subsequent permanency plans remained essentially the same.

The order of termination states:

> The Court finds that the requirements of the permanency plans are reasonable and related to remedying the conditions that caused the children to be removed. Further, the Court finds that [Mother's] noncompliance is substantial in light of the degree of noncompliance and the importance of those requirements that has not been met, as hereinafter set out.
>
> The Petition that led to the children's removal was once again based upon the children's exposure to [Mother's] continuing drug use and her history of incarceration.
>
> Beginning with the Permanency Plan developed November 10, 2015, and the ones going forward, [Mother] failed to comply with the following requirements: she failed to substantially comply with court-ordered child support; she failed to provide safe, suitable and stable housing for herself and the children; she failed to sign the proper releases relative to service providers; she failed to pass random drug screens; she failed to follow recommendations required by the mental health assessment; she failed to timely provide information to DCS relative to mental health providers; she failed to maintain regular contact and follow up with DCS service providers; she failed to follow the rules of probation; she failed to stay clear of criminal charges and she failed to attend family counseling. The Court is skeptical of [Mother's] explanation of how she has completed domestic violence classes.

9

The Court finds that [Mother] has a negative attitude toward DCS and blames DCS for her failure to better herself and regain custody of the children. She has refused to take advantage of services that could have been provided by DCS. The Court finds that [Mother] maintains a negative attitude toward addressing her drug addiction and mental health issues. The Court questions whether [Mother] has even truly addressed her drug addiction. She has drug charges pending. It is troubling to the Court that [Mother] says she "did" have an addiction to Lortab. The Court finds that she cannot see herself as a recovering addict.

The Court finds it problematic in determining whether [Mother] has complied with the permanency plans, in that (1) she made a unilateral decision in determining which out-patient treatment facility she wanted to attend, without any regard to in-patient options, (2) she refused to timely inform DCS of which treatment facility she was attending, and (3) she failed to timely execute appropriate releases of information to DCS concerning treatment.

For example, [Mother] decided to enter Buffalo Valley when her drug and alcohol detoxification and treatment was set up and approved by the Nashville Rescue Mission under a six months program. Instead she entered Buffalo Valley on October 17, 2016, and participated in three days of detoxification on October 20, 2016. Once placed in a half-way house she left against staff advice after only one day. Page 5 of Trial Exhibit No. 7, includes the following language under the section, Conditions and Reasons for Voluntary Discharge: "Prognosis is negative at time of discharge. (Ct) Client maintained a negative attitude throughout treatment, and appears to have a minimal desire for continued change as evidenced by her unwillingness to stay in treatment or accept suggestions given by PC in ways to cope with the stressors of daily living. Ct. left ASA and gained no insight into her destructive behaviors. Ct. did not allow herself time to develop coping skills to deal with daily stressors and emotions and she also refused the opportunity to gain insight into the need for follow up mental health." "Ct. gained no insight into the disease of addiction and co-occurring disorders. Ct. did not have the opportunity to understand the relapse process and/or how to deal with triggers in her life." "Ct. has no tools to continue with her recovery." "Ct. was encouraged to follow up with mental health services to enhance her recovery efforts."

[Mother] failed to notify DCS she had left the half-way house and that she went back to Centerstone. Therefore, DCS had no knowledge of where she was, and there was no timely release of information to DCS by Centerstone.

Another example is [Mother] manipulating the answers to an on-line drug and alcohol assessment (SASSI) by submitting answers based on a time frame she preferred (the day she actually took the test), rather than

10

following the time frame mandated by the assessment (the past 6 months). This assessment took place just after [Mother] left the Buffalo Valley half-way house. Page 8 of Trial Exhibit No. 22 states: "The profile indicates that this client approached the assessment situation in a defensive manner. This may have led to an understatement of any substance use problems."

The Court finds that DCS has carried its burden of proof as to this ground by clear and convincing evidence.

On appeal, Mother does not argue that the plans were not reasonably related to remedying the conditions which caused the children to be removed. Our review of the permanency plans and the record leads us to conclude, as did the trial court, that the requirements of the plans were reasonably related to remedying the conditions that caused the children to be removed from Mother's home, particularly Mother's drug use and mental health issues and the overall lack of safety and stability afforded the children while living in the home.

Mother's arguments on appeal focus on her belief that the record does not contain clear and convincing evidence that she was not in substantial compliance with the plans. She argues that she "was very close to finishing all her requirements in the permanency plan," and cites to proof in the record that she went to Buffalo Valley for detox, attended a domestic violence program, completed an alcohol and drug assessment and mental health intake, and completed individual therapy.

We have examined the evidence cited by Mother and note that she did receive some mental health and alcohol and drug treatment at Centerstone; however, Centerstone closed her case in July 2016 due to Mother's failure to show up for 180 days. Mother's stint at Buffalo Valley occurred after the petition for termination was filed; she went for five days in October 2016 and left that program against the staff's advice.

Ms. Gray, the family services worker who worked with the family during their initial encounter with DCS in 2014 and again in August 2016, testified that she received a certificate of completion for alcohol and drug treatment at Centerstone and for the Keystone Recovery program on behalf of Mother in December 2016; however, she explained that Mother was supposed to have eight individual and eighteen group therapy sessions as part of the Keystone program but Mother did not participate in the required number of sessions, so Ms. Gray was unsure how Mother had been issued a certificate of completion.

Additionally, Mother testified as follows:

Q. Now, would you agree in the family permanency plans, that you were required to complete domestic violence classes?
A. Yes, sir.

11

Q. And you remained with Richard [D.] all the way up until June, July, August of 2016; is that accurate?
A. Yes, sir.
Q. And yet in 2015, he had been or he was abusive to you; is that correct?
A. Yes, sir.
Q. And -- or started being abusive to you in 2015?
A. Yes, sir.
Q. And you remained with him in that home?
A. Yes, sir.
Q. And your prior relationship with James [S.], he had been physically abusive to you as well?
A. Yes, sir.
Q. Did you ever bring any charges of domestic violence or anything against him?
A. I tried to get an order of protection and stuff.
Q. What happened with that?
A. I don't remember.
Q. You don't remember.
A. No, sir. Because that was like in 2010, I think.
Q. And then, of course, the latest incident of domestic violence was with Tony L[.]?
A. Yes, sir.
Q. Which was in December -- less than a month ago, in December?
A. No, it was in November.
Q. I'm sorry, November. So about two months ago?
A. Yes, sir.
Q. And is it fair to say that was an abusive relationship?
A. Yes, sir.

Further, Kristen Gray, the Family Services Worker, and Nicole Miller, the domestic violence shelter volunteer and teacher, testified that Mother did not complete the domestic violence classes and was terminated due to her absences. Ms. Gray also testified that Mother had a mental health assessment with a private practice therapist in March of 2016, but did not attend the therapy sessions regularly.

Though Mother testified at trial that she is sober, the trial court questioned the authenticity of her sobriety. Mother admitted to abusing prescription drugs in October 2016 and incurring drug-related criminal charges in December 2016. Additionally, she was evicted from her apartment at the time of the January trial dates and charged with and pled guilty to shoplifting on February 13, during the pendency of the trial.

From the evidence in the record, it is clear that, throughout these proceedings, Mother has continued to live and interact with abusive men and did not have stable

housing. Mother has not established a safe and healthy home for her children and has failed to adequately address her mental health issues. The evidence clearly and convincingly shows that Mother has not been substantially compliant with the requirements of the permanency plans. Accordingly, we affirm the trial court's holding in this regard.

### C. Failure to Manifest an Ability and Willingness Personally to Assume Legal and Physical Custody or Financial Responsibility

Tennessee Code Annotated section 36-1-113(g)(14) provides:

A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This ground requires DCS to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, DCS must prove that Mother failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Then, DCS must prove that placing the children in Mother's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." *Id.* This Court has observed the following regarding the statute's requirement of "substantial harm":

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

The order of termination of Mother's parental rights states that:

[Mother] has failed to substantially comply with child support obligations; she has not maintained safe and stable housing; she refuses to keep DCS abreast of her living situation; she continues to incur criminal charges and in fact, has criminal charges pending; she has not provided any

13

documentation of compliance with family counseling; and she has refused to timely provide information relative to mental health counseling and domestic violence classes.

At the last hearing the Court was concerned to learn that [Mother] is once again living with an elderly man who in the past has accused her of stealing his Lortab.

The Court finds that DCS has carried its burden of proof as to this ground by clear and convincing evidence.

Mother's brief does not specifically address the ground of her failure to manifest an ability and willingness personally to assume legal and physical custody or financial responsibility of the children. DCS argues as follows in its brief:

Mother lacked the ability to assume custody of the children because she had not demonstrated residential stability, had untreated mental-health and drug issues, and had pending criminal charges. Indeed, Mother was evicted from her home in between trial dates and had resumed living with Mr. J[.], from whom she had stolen Lortab. Mother also failed to attend mental-health treatment and had pending drug-related criminal charges stemming from a December 2016 incident. Mother pled guilty to shoplifting charges in February 2017, stemming from her actions in August 2015, because she failed to pay court costs or make restitution to Wal-Mart; she was placed on probation. Such a display of indifference for her actions by Mother demonstrates an unwillingness to assume custody of the children.

(Citations to the record omitted.)

The evidence at trial established that Mother continued to incur criminal charges throughout DCS's involvement, continued to associate with abusive men, did not complete the domestic violence class, and has struggled to maintain a stable home or job. Also, Mother has mental health issues for which she has not completed treatment. Accordingly, the evidence supports the conclusion that Mother has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the children.

The testimony also makes clear that Mother's failure to fully address her drug addiction, mental illness, and domestic violence issues through therapy, all of which create a substantial hazard or risk of danger to the children's welfare that is not minor, trivial, or insignificant.

The evidence is clear and convincing that Mother has not manifested an ability and willingness to personally assume legal and physical custody or financial

14

responsibility of the children; accordingly, we affirm the trial court's holding in this regard.

## D. Persistence of Conditions

Parental rights may be terminated on the basis of "persistence of conditions" as defined by Tenn. Code Ann. § 36-1-113(g)(3)(A) when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

A termination proceeding based on the persistence of conditions ground requires a finding by clear and convincing evidence of all three statutory factors. *In re Valentine*, 79 S.W.3d at 549.

Pertinent to this ground is the testimony of Darkis Selman, Melinda Brewer, and Dawn Bradley.

Darkis Selman, DCS child protective services investigator, testified that when DCS a received a referral in January 2014 for the children's exposure to drugs, Mother tested positive for methamphetamine, amphetamine, benzodiazepine, and THC. Ms. Selman testified that the children were placed in custody of relatives in January 2014 and returned to Mother in December 2014. A second referral for drug exposed children was received in April 2015; during an interview, Zoey explained to Ms. Selman how Mother crushed pills and used a straw to take them through her nose.

Melinda Brewer, a lieutenant with the Lawrence County Sheriff's Office, testified that she was requested by DCS to make a welfare check at Mother's home in April 2015. During that visit, she testified that the house was "very cluttered"; that there was a "small tooter straw" lying on the bed, a cellophane wrapper with white powder, and an empty

15

prescription pill bottle; and that the dates and quantity number on the bottle reflected improper usage. Additionally, Lt. Brewer stated that Mother was "in a depressed state" and commented that she was going to harm herself.

Dawn Bradley, DCS child protective services supervisor, testified that she went to the home with Lt. Brewer in April 2015 due to the referral for drug-exposed children. Ms. Bradley testified that that Mother's behavior was erratic, that Mother could not stay on the subject, and that getting answers from Mother was a "long process." Mother consented to a drug screen and tested positive for amphetamine, benzodiazepine, methamphetamine, and opiates. She testified that Mother was taken to the hospital and eventually admitted to the psychiatric hospital, Rolling Hills. Ms. Bradley also testified that in September 2016, DCS received another referral a drug exposure and medical maltreatment of a child who is not at issue in this proceeding. However, pertinent to this proceeding is Ms. Bradley's testimony that in September 2016, Mother tested positive for benzodiazepine, methamphetamine, Oxycodone, and opiates. Mother attended drug and alcohol treatment at Buffalo Valley but left, against staff advice, after three days saying that it was "too chaotic" and refused an opportunity for follow-up mental health treatment. Ms. Bradley read the discharge notes relating to Mother's stay at Buffalo Valley into the record, which stated that:

> [Mother] maintained a negative attitude throughout treatment and appears to have a minimal desire for continued change, as evidenced by her unwillingness to stay in treatment or accept suggestions given by team meetings in ways to cope with the stressors of daily living. Client left ASA and gained no insight into her destructive behaviors. . . She also refused the opportunity to gain insight into the need for follow-up mental health.

From the record in this case, it is clear that Zoey and Piper were removed from the home in January 2014 due to Mother's drug use. They were subsequently adjudicated dependent and neglected, a finding which has not been appealed. The children began a trial home visit in September 2014, but due to Mother's continued drug use and suicidal threats, the children were taken into protective custody, again adjudicated dependent and neglected, and placed with a caregiver in April 2015, where they remain. At all times during DCS's involvement with this family, the testimony established that Mother has not had a stable living situation, has continued to involve herself in abusive relationships, and has chosen not to fully address her drug addiction and mental health issues. The proof establishes the conditions which led to the children's removal still persist and there was little likelihood that they would be remedied soon. Meanwhile, the testimony of the foster parent established that the children are happy and healthy in the foster home. Accordingly, we affirm the trial court's conclusion that the proof clearly and convincingly established this ground for termination.[5]

---

[5] In its order entered in April 2017 the court stated:

16

## E. Best Interest

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i) for the courts to follow in determining the child's best interest.[6] The list of factors in the statute "is not exhaustive, and the statute

---

[Mother] continues to live place to place; she has moved again within the past thirty days; she is a victim of domestic violence on a repeated basis; she admits the children were present when domestic violence was occurring in the homes where she and the children were living; the record reveals a third referral to DCS in October of 2016, once again indicating a drug-exposed child, Coan; she continues to incur criminal charges; and she refuses to address her drug addiction and mental health issues, except on her terms. The Court finds that the conditions leading once again to the children's removal will most likely, be the same conditions that persist today. [Mother's] actions reveal she does not want the help of DCS in providing treatment, counseling, or other services. History reveals that [Mother] has appointed herself to be the one to choose providers of drug treatment and mental health treatment. That is, if she so desires. She will be the one who determines and dictates the conditions under which she might participate. The Court finds that [Mother] has never truly addressed her drug addiction.

    The Court finds that DCS has carried its burden of proof as to this ground by clear and convincing evidence.

[6] The factors at Tennessee Code Annotated section 36-1-113(i) are:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of

does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)). As we consider this issue, we are also mindful of the following instruction in *White v. Moody*:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

Pertinent to this determination, the order stated:

> All statutory provisions weigh in favor of termination of [Mother's] parental rights. She has failed to make an adjustment of conduct or conditions as to make it safe and in the children's best interest to be in a home with her. She has moved multiple times to multiple places. As early as thirty days prior to the final hearing herein, she moved once again into the home of the person she calls "uncle," the same disabled person who in the past accused her of stealing his Lortab. [Mother] admitted that the children have been present in her home when physical abuse has occurred. Still she repeatedly brings men into her children's lives who not only abuse her, but do drugs with her.
> [Mother] has ignored and refused to accept help from available social services offered by DCS. She has failed to effect a lasting adjustment, after reasonable efforts by available social services agencies, for such duration of time that lasting adjustment does not reasonably appear possible.
> There is a relationship and bond between the children and [Mother]. Once visitation was set up, [Mother] did visit with the children. However,

---

alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

her conduct led to the reinstatement of supervised, therapeutic visitation, as set out herein.

The Court finds that a change of caretakers and physical environment, especially a different physical environment, is likely to have a devastating effect on the children's emotional and psychological conditions. It is unknown where [Mother] will live next, and with whom. Moreover, it is unknown when and with whom, [Mother] will next choose to move in with.

[Mother] testified she previously lived with "Uncle" Don J[.] for some one to two months. She has landed there once again for some thirty days. [Mother] has moved so many times, and for such short durations, it has proved difficult for DCS to check out the physical environments of her residences. The Court does not know if the home of Mr. J[.] is healthy and safe. The Court knows that Mr. J[.] is 68 years old and disabled. Mr. J[.] has a prescription for Lortab, [Mother's] drug of choice. The Court does not believe [Mother's] denial of stealing Mr. J[.]'s Lortab in the past.

The Court finds that [Mother] has not truly addressed her drug addiction. Indeed, she has pending drug charges of simple possession of Lortab. She has pending charges of possession of drug paraphernalia and tampering with evidence, to-wit: the destruction of a glass pipe used for ingesting drugs. [Mother] was arrested on these charges just three months ago, on December 7, 2016.

Ms. [B.] and Ms. [V.] are not perfect; however, they have provided a safe, stable and nurturing home for the children since April of 2015. It is time for the children to have some permanency in their lives.

The Court finds that Petitioner has carried its burden of proof by clear and convincing evidence, and finds that termination of the parental rights of [Mother] is overwhelming[ly] in the best interest of the children.

These findings relate to factors (1), (2), (3), (4), (5), (7), (8), and (9). From our review of the record, we conclude that the trial court's findings are supported by clear and convincing evidence.

On appeal, Mother does not challenge any specific finding of the court relating to the children's best interest. She concedes that she has not made a lasting adjustment to her circumstances, which relates to factors (1) and (2), but argues that she has made "significant steps in the right direction . . . and might be able to make a lasting adjustment in the near future."[7] Her arguments on appeal relating to the children's best interest focus

---

[7] In the section of her brief discussing the grounds for termination, Mother appears to vaguely question the efforts of DCS, which is pertinent to factor (2) of the factors to be considered in the best interest determination, but she does not explicitly argue that the efforts were not reasonable. Mother's brief states:

on the foster mother and her adult daughter who lives in the home and who also cares for the children. Mother takes issue with a shoplifting charge both women received that was dismissed and the home in which they live; in support of her arguments, she cites to only three pages of testimony out of a voluminous record. We have reviewed that testimony and conclude that it does not preponderate against the court's conclusion that the foster parents "are not perfect"; however, we are not persuaded that the dismissed shoplifting charges or a small home outweigh the safety and stability the children have found in that home.

Viewing the evidence bearing on best interest from the viewpoint of the children, it is clear that Mother has not made a lasting adjustment in her circumstance, despite the reasonable efforts of DCS, such that it is in the children's best interest to live with Mother. Mother has not completed the recommended inpatient drug therapy, mental health therapy, or domestic violence classes, and shows no clear pathway to consistent and lasting improvement.

Factor (3) requires us to consider whether Mother visited the children. The record establishes that Mother did visit the children, and, according to the foster parent who testified, that "the girls always ask when is their next visit." However, the record also shows that Mother's visitation was changed from supervised to unsupervised in June 2016 due to Mother's behavior, which upset the children when she mistreated a puppy. Further, the foster parent testified that Mother made promises to bring the children cupcakes, which the girls were "extremely excited" about, as well as a computer tablet at a visit that was to take place around Christmastime. Mother came to the visit with only lip balm and lunch for the girls.

---

Mother was completing the individual therapy with Michelle Reese but DCS caseworker was unaware since she had not obtained the records or reports. [Citation to the record omitted.] Mother called DCS and kept in touch with her caseworker even at times she did not have minutes on her phone. The DCS caseworker admitted that she did not know what the Mother had accomplished. She said she went to the home of the Mother to do a walk-through on the home even though she had just seen the mother leaving the residence and the mother had reported she lived alone. [Citation to the record omitted.] DCS caseworker Christian Slater [sic] did not talk to the mother by phone, she only left messages on voicemail. [Citation to the record omitted.] The caseworker reported she had never helped the Mother reunite with her children except for giving her a resource guide and answer the Mother's questions. [Citation to the record omitted.]

The record contains evidence that DCS provided Mother with resource material to assist her in completing the requirements of the permanency plan, including low income housing options and gas cards. Family Services Worker, Kristen Gray, testified that she knew that Mother did not have transportation; however, Mother told Ms. Gray that she had "friends and other people that were helping her from getting from place to place." From our review of the record, we find that DCS made reasonable efforts in this case.

20

With respect to factor (4), whether a meaningful relationship has been established between the children and Mother, testimony in the record shows that the children knew who their Mother was, had a meaningful relationship with her, and looked forward to seeing her or talking to her during visits.

With respect to factor (5), the record establishes that since April 2015, Zoey and Piper have been living in a safe and stable home with the current caregivers, Pamela B. and her daughter, Tiffany V., as well as Ms. V's husband and son. The record supports a conclusion that both children are happy, healthy, and are doing well in school and socially.

With respect to the physical environment of Mother's home and her mental and emotional status, factors (7) and (8), Mother testified that she incurred a drug related charge in December 2016 and shoplifting charges in between the dates of the trial. Mother's living situation is precarious, and it appears from the testimony that her drug addictions and her mental health issues still require intensive work on her part, such that she is unable to provide safe and stable care and supervision for the children.

Regarding factor (9), Mother did not pay child support in accordance with the guidelines, though she did contribute some when she was employed and able to do so.

In light of the evidence as a whole, we conclude that termination of Mother's rights is in the children's best interest.

## III. CONCLUSION

For the foregoing reasons, we reverse the trial court's termination of Mother's rights on the ground of abandonment by willful failure to support; in all other respects the judgment is affirmed.

RICHARD H. DINKINS, JUDGE

21